# IN THE COURT OF APPEALS OF IOWA

No. 22-0142
Filed August 31, 2022

**CONNER NICHOLAS RIEHM,**
Petitioner-Appellant,

**vs.**

**KAYLA MICHELLE WASSON,**
Respondent-Appellee.
_____

Appeal from the Iowa District Court for Black Hawk County, Joel Dalrymple, Judge.

Conner Riehm appeals the order modifying physical care of his child. **AFFIRMED.**

Kevin D. Engels of Correll, Sheerer, Benson, Engels, Galles & Demro, PLC, Cedar Falls, for appellant.

John J. Wood of Beecher, Field, Walker, Morris, Hoffman & Johnson, P.C., Waterloo, for appellee.

Considered by Bower, C.J., and Schumacher and Ahlers, JJ.

**AHLERS, Judge.**

Conner Riehm and Kayla Wasson have one child together—a son born in 2016. The parties entered into a stipulated and court-approved parenting agreement in 2017, under which they agreed to joint legal custody and joint physical care of the child. In 2020, the mother filed a petition for modification seeking sole legal custody and physical care of the child. After a modification trial, the district court ordered continuing joint legal custody but placed physical care with the mother. The court granted visitation to the father on every other weekend, every other Wednesday overnight, and alternating weeks in the summer. The court also ordered the father to pay child support consistent with the new physical-care arrangement. The father appeals the modification of physical care and child support. The mother seeks appellate attorney fees.

The mother and father never married, so their dispute over physical care is governed by Iowa Code chapter 600B (2020). The same standards that apply to modification between formerly married parties also apply to parents who never married. Iowa Code § 600B.40(2) (stating Iowa Code § 598.41 "shall apply" when "determining the visitation or custody arrangements of a child born out of wedlock"). We review a modification of physical care action de novo. *Christy v. Lenz*, 878 N.W.2d 461, 464 (Iowa 2016). We give weight to the fact findings of the district court, especially as to the credibility of witnesses, but we are not bound by them. *Id.* When a parent with joint physical care seeks to modify the decree to place the child in that parent's physical care, we apply well-established principles:

> Courts can modify the custody and care provisions of a dissolution decree only when there has been "a substantial change in circumstances since the time of the decree, not contemplated by the

> court when the decree was entered, which was more or less permanent, and relates to the welfare of the child." *Melchiori v. Kooi*, 644 N.W.2d 365, 368 (Iowa Ct. App. 2002). The parent seeking to change the physical care provision has a heavy burden and must show the ability to offer superior care. *Id.* Where there is an existing order for joint physical care, both parents have been found to be suitable primary care parents. *Id.* at 369. If it is determined the joint physical care agreement needs to be modified, the physical care provider should be the parent "who can administer most effectively to the long-term best interests of the children and place them in an environment that will foster healthy physical and emotional lives." *In re Marriage of Walton*, 577 N.W.2d 869, 871 (Iowa Ct. App. 1998).

*In re Marriage of Berns*, No. 13-0013, 2013 WL 4009678, at *2 (Iowa Ct. App. Aug. 7, 2013).

The mother points to the father's history of injuring the child by physical discipline as a change in circumstances justifying a change in physical care. The first injury inflicted on the child occurred in 2018. The mother noticed a hand-shaped bruise on the child's buttocks while bathing him. The father admitted he had spanked the child's bare buttocks earlier in the day during his parenting time. The mother took the child to the emergency room where a doctor confirmed the bruising was consistent with the child being spanked on the bare buttocks. The injury led to a child abuse investigation by the Iowa Department of Human Services (DHS). The DHS report from the investigation states the father initially denied injuring the child but later admitted to spanking the child's bare buttocks. The DHS report also states that the father agreed he would not spank the child in the future. Based on the circumstances, no additional action was taken.

If the 2018 incident had been the end of it, we would agree with the father that the isolated incident would not warrant modification of physical care. But the 2018 incident was not the end of it. In 2020, the then-four-year-old child returned

from the father's care with a bruised cheek and a chipped tooth. This led to another DHS investigation and a police investigation. At the modification hearing, the father provided the following explanation for the child's injuries:

> Q. What happened in March of 2020? A. We were on a bike ride and we were maybe, like, two, two blocks from home, and [the child] would stop pedaling. And I kind of didn't know how I was going to get him home, I guess, and so I kind of gave him a swat on the— we were both at a stop and he wouldn't pedal. I gave him a swat on the butt.
> Q. How did you give him a swat on the butt if he was on his bike? A. Just, like, the top of his butt pretty much.
> Q. Is he still sitting on the bike seat? A. Yes.
> Q. Okay. What happened when you did that? A. He lost his balance and he tipped over and then he hit his face on my bicycle.

Notes from the DHS investigation show the father provided a similar explanation at the time. The notes also state the father asserted "he has every right to spank his son."

In contrast to the father's version of the incident, the record shows the child consistently provided a different explanation of the 2020 injuries. When the mother discovered the injuries, the child said the father "hit him in the face and grabbed his mouth and told him to stop talking." The DHS notes state the child, when asked about the father, said, "Hit me in the face, grabbed me." A doctor's note states the child, when asked what happened, said the father "put his hand in [the child's] mouth so [the child] wouldn't talk anymore." The child underwent a forensic interview as part of the police investigation, and notes from that interview state the child said the father "hit his 'head' with his hands while on a bike ride" and the child "gestured on his body as being hit on his 'belly' by" the father.

In resolving the conflicting versions of how the injury occurred, it is worth noting that the DHS investigator witnessed the child's bruised cheek and chipped

tooth but did not see other injuries on the child, including on the palms and arms—areas one might expect to see signs of scrapes or other injuries from the child trying to break his fall if the event had occurred as described by the father. We also note that the police investigation of the injury resulted in the father being charged with child endangerment. The father entered an *Alford* plea to the child-endangerment charge. *See North Carolina v. Alford*, 400 U.S. 25, 37–38 (1970) (permitting a criminal defendant to enter a guilty plea without admitting guilt by acknowledging strong evidence of guilt and voluntarily, knowingly, and understandingly agreeing to allow the court to consider such strong evidence of guilt in accepting the guilty plea). The court imposed a deferred judgment and placed the father on probation.[1]

On our de novo review, the father's explanation of the 2020 injury is difficult to believe. According to the father, he spanked the child's buttocks while the child was seated on a bicycle, which made the child fall towards the father face-first into the father's bicycle with enough force to cause a bruised cheek and chipped tooth without causing injury to the child's palms or other areas of his body that would be consistent with bracing himself from the fall. The child's explanation, that the father hit him in the mouth, is more straightforward, plausible, and consistent with the corroborating evidence.

Even accepting the father's explanations of the child's injuries, the father's behavior is concerning. Since entry of the initial decree, the father bruised the

---

[1] At the modification trial, the district court took judicial notice of the minutes of testimony from the child-endangerment proceeding without objection. We have considered the same minutes.

child while attempting to use physical discipline in 2018. This first injury led to DHS involvement, during which the father seemingly recognized the problems with his ability to properly utilize physical discipline and agreed to refrain from using physical discipline in the future. Nevertheless, the father again injured the child while using physical discipline in 2020. This injury was serious enough to generate a child-endangerment charge, and the evidence against the father was so strong that he agreed it supported finding him guilty via entry of his *Alford* plea.

As noted earlier, the father resisted criticism of his actions by insisting that he had the right to discipline his child with corporal punishment. We agree with him that he has that right. *See State v. Benson*, 919 N.W.2d 237, 242 (Iowa 2018) (acknowledging a parent's right to use corporal punishment). However, that right has limits. It is limited by "moderation and reasonableness." *Id.* (quoting *State v. Arnold*, 543 N.W.2d 600, 603 (Iowa 1996)). When the conduct crosses "the line of reasonable correction, [the] conduct becomes criminal." *Id.* (quoting *Arnold*, 543 N.W.2d at 603). The father crossed the line into criminality here. He has demonstrated a pattern of using excessive discipline despite warnings and a promise not to do so. This pattern of excessive discipline presents a substantial change in circumstances justifying a change in physical care.

Turning to the child's best interests, the father's pattern of excessive discipline again raises concerns. Spanking the child for stopping during a blocks-long bicycle ride shows the father does not have a proper understanding of a four-year-old child's capabilities, when to use discipline, or how much discipline to use.[2]

---

[2] We make this observation using the father's version of events to show that even under that unbelievable narrative, he showed a remarkable lack of judgment. As

The father does not raise any concerns with the mother's parenting, and, during the trial, he acknowledged she is a good mother. We note the mother admitted she moved "about three" times and was briefly married to a man with criminal and substance-abuse issues since the initial custody order. However, she now lives with her boyfriend of almost one year and she has held the same employment for over one year—demonstrating her increased stability. The mother acknowledged she "made a lot of bad decisions in" her past, but her testimony shows increasing stability in her life. Placing physical care of the child with the mother is in the child's best interests. She has shown the ability to provide superior care to the child. *See In re Marriage of Lehman*, No. 21-0468, 2021 WL 5919046, at *3 (Iowa Ct. App. Dec. 15, 2021) (noting the lesser burden to change physical care when starting from joint physical care and permitting such change upon showing of superior or better ability to care for the child). Therefore, we affirm the modification of physical care.

As for the father's challenge to the child support, the challenge is limited to the assertion that child support should be changed if physical care were returned to joint physical care. As we have determined physical care is properly placed with the mother, the condition upon which the father bases his challenge has not been met, so we also affirm the modification of child support to reflect that the mother now has physical care of the child.

---

previously noted, we find more persuasive the evidence that the 2020 episode involved the father striking the child in the mouth for talking. This too demonstrates improper use of excessive discipline, as confirmed by the successful criminal charge against the father.

The mother requests appellate attorney fees based on her status as the prevailing party on appeal. *See* Iowa Code § 600B.26. We may award appellate attorney fees as a matter of discretion. *In re Marriage of Hoffman*, 891 N.W.2d 849, 852 (Iowa Ct. App. 2016). "In determining whether to award appellate attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the decision of the trial court on appeal." *Id.* (quoting *In re Marriage of Kurtt*, 561 N.W.2d 385, 389 (Iowa Ct. App. 1997)). While the mother prevailed on appeal, she acknowledges both parties have similar incomes, and the father testified he is already paying a significant amount of legal and other debt. We deny the mother's request for appellate attorney fees.

**AFFIRMED.**